## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| CHERELLE MATCHETT, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. 2022-43 |
| vs. | ) | |
| | ) | |
| KAREN NELSON-HUGHES, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

This personal injury action arises out of plaintiff Cherelle Matchett's alleged slip and fall accident at a rental property owned by defendant Karen Nelson-Hughes. *See* Amend. Compl. [ECF 8]. Following an April 10, 2024 discovery conference, the parties submitted briefing addressing whether plaintiff's neuropsychological examination by defendant's expert may be videorecorded. Plaintiff requests that the Court allow videorecording to ensure reliability and accuracy of the exam. [ECF 96]. Defendant opposes recording, citing concerns about test confidentiality and validity of the results. [ECF 95].

### I.    LEGAL STANDARDS

The court, "on motion for good cause[,] . . . may order a party whose mental or physical condition . . . is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner." Fed. R. Civ. P. 35(a).[1] Rule 35 grants courts discretion to "specify the

---

[1] "A plaintiff in a negligence action who asserts mental or physical injury places that mental or physical injury clearly in controversy and provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury." *Schlagenhauf v. Holder*, 379 U.S. 104, 119 (1964) (internal citation omitted). Here, defendant asserts good cause because plaintiff has (1) "conceded that her mental health condition is in controversy," and (2) "has directly claimed mental and psychiatric injuries." [ECF 95] at 2. Plaintiff does not dispute the appropriateness of a Rule 35 neuropsychological examination.

time, place, manner, conditions, and scope of the examination, as well as the person or persons

who will perform it."   Fed. R. Civ. P. 35(a)(2)(B); *see also Nicholas v. Wyndham Int'l, Inc.*, 218

F.R.D. 122, 124 (D.V.I. 2003) ("Rule 35 provides judges with considerable leeway"); *Smolko v.*

*Unimark Lowboy Trans., LLC.*, 327 F.R.D. 59, 61 (M.D. Pa. 2018) ("Rule 35 consigns the

procedures to be used in conducting these examinations to the sound discretion of the court").

Additionally, the Court of Appeals for the Third Circuit has acknowledged that "matters of docket

control and conduct of discovery are committed to the sound discretion of the district court."   *In*

*re Fine Paper Antitrust Litig.*, 685 F.2d 810, 817 (3d Cir. 1982).   Accordingly, while Rule 35 "is

silent as to the presence of outside observers during the examination and the recording of the

examination[, t]he Court has discretion to decide whether such presence is a proper 'condition' of

the examination, based on the information presented."   *Cato v. Twp. of Andover*, 2018 WL

1639692, at *2 (D.N.J. Apr. 5, 2018); *accord Brewer v. Norfolk S. Ry. Co.*, 2023 WL 1529382, at

*2 (N.D. Ga. Feb. 3, 2023) (Rule 35 "gives courts 'discretion' to 'permit the presence of a

recording device at [the] examination'" (citation omitted)); *see also Wright v. Hobby Lobby Stores,*

*Inc.*, 344 F.R.D. 538, 541 (D. Colo. 2023) ("To satisfy the purposes of Rule 35(a), the court may

in its discretion enter appropriate protective orders pursuant to [Rule] 26(c)."); *Hertenstein v.*

*Kimberly Home Health Care, Inc.*, 189 F.R.D. 620, 630 (D. Kan. 1999) (Rule 26(c) "provides

authority for appropriate conditions upon the examination").

    In the absence of any inherent right to a third-party observer ("TPO") or recording device,

courts have found that the party seeking such condition bears the burden of convincing the court.

*See Hertenstein*, 189 F.R.D. at 630; *Wright*, 344 F.R.D. at 545–46; *see also Cato*, 2018 WL

1639692, at *3 (noting the absence of controlling Third Circuit precedent on allowing a TPO or

recording, and stating the majority rule in federal courts is to exclude outside observers); *Nicholas*,

*Matchett v. Nelson-Hughes*
Civil No. 2022-43
Page 3

218 F.R.D. at 124 ("there is no compelling 'longstanding rule'" as to whether a Rule 35 exam may be recorded or not).[2]  Some courts, including district courts within this Circuit, require the requesting party to show good cause.  *See, e.g.*, *Cato*, 2018 WL 1639692, at *2; *Smolko*, 327 F.R.D. at 62; *see also Tarte v. United States*, 249 F.R.D. 856, 859 (S.D. Fla. 2008) (requesting party "bears the burden of demonstrating 'good cause' for the request under Rule 26(b)"); *Ornelas v. S. Tire Mart, LLC*, 292 F.R.D. 388, 395–97 (S.D. Tex. 2013) (same).[3]  Other courts phrase the required showing as one of "specific need," *Ren v. Phoenix Satellite Television (US), Inc.*, 309 F.R.D. 34, 36 (D.D.C. 2015), "compelling reason," *Tomlin v. Holecek*, 150 F.R.D. 628, 633 (D. Minn. 1993), or "special circumstances."  *Newman v. San Joaquin Delta Cmty. Coll. Dist.*, 272 F.R.D. 505, 515 (E.D. Cal. 2011); *Ussatis*, 2019 WL 2250268, at *2.  "Whether the court permits the presence of a third person, either mechanical or human, depends upon the facts of the case." *Hertenstein*, 189 F.R.D. at 630.  Such condition might be warranted "where the examinee is a minor, does not speak the relevant language, or suffers from a disability that might impair his or her ability to communicate to counsel what occurs during the examination, or where evidence otherwise suggests that recording would be advisable."  *In re UV Logistics, LLC*, 682 S.W.3d 612, 623 (Tex. App. 2023) (citation omitted) (collecting cases).  Conversely, courts have declined

---

[2] The District of North Dakota observed:

> A number of courts (perhaps, the majority) have taken the position that a recording should not be permitted absent good cause for requiring a recording.  Others have held differently, with several concluding that an audio recording would not be unduly obtrusive, would help insure the diagnostic interview is kept within proper bounds, and would assist plaintiff's counsel in evaluating the results as well as provide a source of information for cross-examination if the results are contested.

*Ussatis v. Bail*, 2019 WL 2250268, at *3 (D.N.D. May 24, 2019) (collecting cases).

[3] Defendant, citing *Hertenstein* and *Tarte*, contends that a party seeking the presence of a third person or recording device must show good cause under Rule 26(c) for the protections sought.  [ECF 95] at 14.  Plaintiff, citing *Wright*, similarly states that she bears the burden to show good cause for the requested condition.  [ECF 96] at 2.

*Matchett v. Nelson-Hughes*
Civil No. 2022-43
Page 4

to permit a TPO or recording device where the requester's argument is based on the inherently adversarial nature of the examination, the fact that the examiner was selected by opposing counsel, or the fear that the examination will become a de facto deposition.[4]   Courts have further declined requests where the argument is based on the theoretical potential for misconduct,[5] and the desire to obtain an accurate account.[6]

## II.    DISCUSSION

Applying these concepts to the instant dispute, the Court finds the following:

First, defendant's argument that recording presents an ethical violation is not persuasive. Defendant contends that "each of the national organizations regulating the practice of neuropsychology has published a position paper strongly condemning the presence of [TPOs] and recording devices," and urges that the Court "should be hesitant to substitute [its] judgment for that of a medical professional with respect to the methodology of the [] examination."   [ECF 95]

---

[4] *Cato*, 2018 WL 1639692, at *3; *but see Brewer*, 2023 WL 1529382, at *2 (citing Wright & Miller and finding plaintiff's exam was an important event in the development of the case and "could easily be transformed into a de facto deposition," and further reasoning that the inherently adversarial nature of a Rule 35 exam distinguishes it from other exams, "making it fair to record the former but not the latter"); *Gavenda v. Orleans Cnty.*, 174 F.R.D. 272, 274 (W.D.N.Y. 1996) (finding plaintiff's fears were overstated and safeguards in federal rules are generally sufficient to protect a party's rights; however, court was not persuaded by defendant's claim that recording would destroy candor, noting exam was by definition subjective, and ultimately allowing recording).

[5] *Cato*, 2018 WL 1639692, at *3; *Hertenstein*, 189 F.R.D. at 633 (movant must present facts to validate alleged fear that examiner will utilize improper techniques); *see also Ussatis*, 2019 WL 2250268, at *5 (plaintiff failed "to demonstrate either actual bias on the part of defendant's expert or the likelihood he will not follow accepted professional practices and ethical norms"); *Shirsat v. Mut. Pharm. Co.*, 169 F.R.D. 68, 71 (E.D. Pa. 1996) (court denied request for observer based on claim that examiner was not neutral, where plaintiff made no allegations that examiner employed unorthodox or harmful techniques and offered no evidence of bias; court did not address plaintiff's request based on her alleged language difficulty).

[6] *Cato*, 2018 WL 1639692, at *4 (finding other safeguards to ensure fairness and validity: plaintiffs would have personal knowledge of how exam was conducted, examiner was required to provide report to plaintiffs, and examiner could be cross-examined and plaintiffs could submit contrary evidence); *Ornelas*, 292 F.R.D. at 396–97 (denying request to record where plaintiff asserted right to preserve evidence of exam, accuracy of examiner's notes, and tone of voice, finding plaintiff proffered no special circumstances that would justify recording); *Newman*, 272 F.R.D. at 515 (plaintiff requested videorecording for her "peace of mind" and to provide a reference for the jury as to what occurred during exam; court found plaintiff did not show special circumstances, and desire to use recording for impeachment purposes was not a valid reason).

at 5.   That some professional organizations would prefer not to allow TPOs or recording is not controlling; such position statements have no binding regulatory effect on practitioners, and the American Psychological Association, which is the body governing the practice of psychology and its various branches, has no ethical rule against recording.[7, 8]

Second, most of the studies on how observation affects test performance involve human observers, not recording devices.   The Eastvold article defendant heavily relies on evaluated 62 studies on the effects of a TPO on cognitive test performance, but only four of those studies involved audio or videorecording—a fact that defendant omits.   *See* [ECF 95] at 12–13; [ECF 95-6] at 9, 13.[9]   The Eastvold article thus cautioned that while a nonhuman observer had a negative impact on performance, "the small sample size . . . makes the true strength of this effect difficult to interpret," and "replicability of these findings and confirmation of the magnitude is needed." *Id.* at 13, 18.[10]   Additionally, none of studies examined by Eastvold involved personal injury

---

[7] According to plaintiff's expert's affidavit, the APA Ethical Principles of Psychologists and Code of Conduct "applies to all psychologists including neuropsychologists, [and] does not in any way restrict evaluating psychologists from recording evaluations to be used in legal proceedings."   [ECF 96-1] at 14; *see also* Sims [ECF 96-4] at 53 (neither the APA nor the state licensing boards prohibit audio or videorecording or TPOs).   Rather, the requirement is that "[p]sychologists make reasonable efforts to maintain the integrity and security of test materials and other assessment techniques."   [ECF 96-1] at 14 (quoting Section 9.11).   Moreover, the APA Specialty Guidelines for Forensic Psychology specifically contemplate recording as one method of documentation to be used by evaluators "to allow for reasonable judicial scrutiny and adequate discovery."   *Id.* at 21.

   Additionally, the position papers defendant quotes urge exclusion of TPOs, but do not specifically address recording devices.   *See* [ECF 95] at 6.

[8] See the Otto article for a discussion of the APA's guidance to psychologists on whether to allow a TPO, and a critique of other organizations' policy statements on TPOs.   [ECF 96-3] at 4–5.

[9] Plaintiff also refers to the Eastvold article via the *Wright* court's discussion of that study.   The Court here makes clear what *Wright* implied: Eastvold offers little basis to support the denial of a litigant's request for audio or videorecording of a Rule 35 examination.   Accordingly, for the reasons discussed herein, the Court finds that Eastvold has little applicability to the present matter, and certainly does not stand for defendant's overbroad claim that Eastvold's meta-analysis "demonstrates to a statistically significant degree that subjects perform worse when they are observed, and worse still when that observer is a video camera or audio tape."   [ECF 95] at 13.

[10] Significantly, the article also noted that for studies that actually had a TPO present, there was a negative but small effect on the examinee's performance; further, "the effect of merely one TPO had a minimal impact on performance," with multiple TPOs having a greater impact.   [ECF 95-6] at 18.

plaintiffs or parties to litigation; the vast majority of study participants were healthy undergraduate students. *Id.* at 9, 11; *see also* Otto [ECF 96-3] at 2 ( "there is little research that addresses the effects of third party presence on forensic examinees [] specifically"); [ECF 96-1] at 29 (plaintiff's expert's avers that "[n]o one has ever published a single study that demonstrates within litigated examinations the effect of being observed . . . or being recorded").[11]   Eastvold further noted that it was "questionable" to use social psychology studies to draw inferences about TPO effects in neuropsychological exams, and thus concluded it was "unknown to what extent the results of this meta-analysis generalize to neuropsychological evaluations of typical clinical or forensic populations."   [ECF 95-6] at 19.[12]

Third, the Court further finds defendant's arguments as to validity lacking in substance. As to the notion that plaintiff's test results will be skewed if recording is allowed because the normative sample groups to which plaintiff's results will be compared did not involve TPOs or recording devices, the Court notes that plaintiff's results are already not directly comparable to these sample groups because the standardization studies were not based on individuals who were active parties to litigation.   *See* Otto [ECF 96-3] at 7 ("almost all psychological and neuropsychological instruments have not been normed on individuals involved in legal proceedings").   Additionally, "[t]rust between examiner and examinee is one of the essential

---

[11] The Sims article contends that "[d]efense experts' arguments against video recording and third-party observation [] ignore the reality of litigation," where plaintiffs "must answer questions and be evaluated for credibility while being recorded" and observed by others during depositions, hearings, and trial.   [ECF 96-4] at 51.   Sims further suggests that TPO "research conducted before the age of video may need to be revisited because people now understand they are constantly being recorded," and that "being recorded has far less chance of altering behavior now that people are used to being recorded."   *Id.* at 51–52; *see also Brewer*, 2023 WL 1529382, at *2 ("Modern audio-recording devices are small, 'unobtrusive, quiet, and . . . often forgotten after the first few minutes of a proceeding.'" (citation omitted)).

[12] Defendant's brief and supporting exhibits tend to lump audio and videorecording together with human observers. While defendant is generally correct that courts tend to treat TPOs and recording devices in the same way, *see* [ECF 95] at 3, no case cited by defendant, nor any other case discovered by the Court, "explain[s] in a persuasive way why a recording device . . . should be treated the same as a human observer."   *Wright*, 344 F.R.D. at 543.

underpinnings of valid and reliable testing," but in the context of a compulsory Rule 35 exam, plaintiffs may distrust defense examiners from the start and perceive them as averse to the plaintiff's claim for damages.  [ECF 96-1] at 12; *see Wright*, 344 F.R.D. at 542 ("Although, in theory, an I.M.E. is to be scientific rather than adversarial, experience suggests that it is often the latter." (quoting *Gensbauer v. May Dep't Stores Co.*, 184 F.R.D. 552, 553 (E.D. Pa. 1999))).  Plaintiff's expert points out the illogicality of agreeing to examine a litigant using tests that were not designed for or normed to individuals with a stake in the outcome of the testing, but then claiming that it invalidates the results if the exam is recorded.  [ECF 96-1] at 11.[13]  He further states that in his review of over 60 assessments that were videorecorded, only a few examiners noted that the test was recorded, and "NONE of them identified that video recording created any sort of impediment to standard interpretation of test results."  *Id.* at 27.  For these reasons, the Court finds defendant's assertion that if recording is allowed, the examiner will be "forced to conduct an examination that she knows will generate invalid results," to be an exaggeration without factual support.  [ECF 95] at 9.[14]

---

[13] The Otto article is interesting because it points out that the academy position statements specifically object to observation by an "involved" third party (i.e., attorneys or their representatives).  [ECF 96-3] at 4–5; *see also* [ECF 96-1] at 12 (plaintiff's expert avers that "[p]sychologists readily and commonly bring assistants and supervisees into the testing situation, or they themselves sit in the testing session while their assistants administer tests").  Otto opines:

> [W]e think it inconsistent that psychologists who conduct forensic evaluations can argue that almost all of the tests they use—which were normed under conditions very different from those under which a forensic examinee completes them— provide valid data, but if psychologists administer these same tests in the presence of third parties not nominated by themselves, then the test data somehow become invalid.

[ECF 96-3] at 7.  The Court agrees.

[14] Moreover, the examiner is not being "forced" to do anything—she may exercise her professional judgment and agree to examine the plaintiff or not.  The Court rejects any suggestion that an examiner's personal preference somehow usurps the Court's authority to set the conditions of the examination.  *See Wright*, 344 F.R.D. at 545 (an affidavit's "veiled suggestion" that if the court requires recording, the expert will refuse to conduct the exam, "is not an acceptable basis for declining to impose an otherwise appropriate condition on a Rule 35 exam[]").  And, as one court observed, "[t]he examiner is [] a professional, paid to assist in litigation.  That person ought to be able to do his

*Matchett v. Nelson-Hughes*
Civil No. 2022-43
Page 8

Defendant further contends results are invalidated by the presence of a TPO or recorder because of social facilitation phenomenon, the theory that "the mere presence of another alters one's behavior." [ECF 95-6] at 4; *see* [ECF 95] at 10. But defendant's broad claim that "recorded and/or observed subjects consistently perform worse in neuropsychological testing than unobserved and unrecorded subjects" is not supported by defendant's own authorities. [ECF 95] at 10. According to the Eastvold article, social facilitation theory research has shown that "the mere presence of others may facilitate performance on simple or well-learned tasks and can impair performance on complex or novel tasks," but "the overall effect is small, explaining only 0.3–3% total variance." [ECF 95-6] at 4. The Essig article defendant quotes notes these same effects on simple versus complex tasks. [ECF 95-4] at 18. Significantly, the Eastvold article cautions that much of the social facilitation theory research focuses on comparisons between individuals performing a self-administered task alone versus in the presence of another, and thus is not directly analogous to the neuropsychological exam setting, "[g]iven that all neuropsychological testing takes places in the presence of an examiner." [ECF 95-6] at 5. It therefore "may be inappropriate" to rely on this research "to infer effects of a third presence on neuropsychological test performance." *Id.* Eastvold further notes that while a few studies have specifically examined the effect of a TPO on neurological testing and reported poorer performance on measures such as verbal learning, memory, and attention, "results of these studies were somewhat inconsistent." *Id.* As such, it is difficult to make any definitive conclusions due to lack of overlap of tests and domains measured, and variations in magnitude of effect. *Id.* The Court thus declines to credit defendant's assertion that "studies suggest that statistically, Plaintiff will perform worse on the test areas, particularly memory loss, for which she is seeking damages by

---

or her job despite the presence of a recording device." *Brewer*, 2023 WL 1529382, at *2.

virtue of having her examination recorded." [ECF 95] at 11.[15]  The Court has been presented

with no evidence demonstrating that videotaping the exam makes it more likely that plaintiff will

exaggerate or emphasize certain responses.  If it is truly plaintiff's desire to manipulate the

examination, then recording will not alter that desire.

Fourth, in the absence of any binding Third Circuit law on this issue, if it is plaintiff's

burden to show good cause to allow recording, the Court finds that she has met it.  Particularly of

concern here is the nature of plaintiff's alleged injuries.  Plaintiff has claimed short term memory

loss and trouble concentrating, and there is a real possibility that she may not be able to accurately

represent to her counsel what took place during the exam.  *See, e.g.*, *Schaeffer v. Sequoyah*

*Trading & Transp.*, 273 F.R.D. 662, 664 (D. Kan. 2011) (finding videorecording would provide

the court with the best evidence of whether defendant's expert conducted a fair exam and if

plaintiff manipulated the exam, and further expressing doubt that plaintiff was capable of relaying

to his counsel what took place during exam).

Moreover, testing protocols require that neuropsychological tests be conducted in specific

ways.  Accuracy and validity of results is dependent on whether the exam was properly

administered, the examinee's responses recorded correctly, and the exam properly scored.  The

Court finds persuasive plaintiff's assertion that, as in *Wright*, recording is important here because

---

[15] Defendant specifically cites the Constantinou article, which conducted a study of 64 undergraduate students and found that "[t]he presence of a video camera as a [TPO] resulted in adverse performance on memory testing." [ECF 95-5].  The Constantinou study was included in the Eastvold meta-analysis, and the Court defers to Eastvold's caution that "definitive conclusions regarding the effects of TPOs [on neuropsychological testing] are difficult to make." [ECF 95-6] at 5.

Further, the Otto article emphasizes that while a TPO can affect the examinee's performance, "there are myriad factors that can have greater or similar effects on the psychological evaluation process," including "what is likely the most significant variable—the nature and purpose of the evaluation." [ECF 96-3] at 6; *see also* Eastvold [ECF 95-6] at 19 (differential effects of TPO on neuropsychological testing "may be further mediated by mood and personality characteristics of the observed, the context of the evaluation, [and] the complexity of the task").  Otto thus suggests that the presence of a third party "is likely a lesser threat to the validity of conclusions drawn from psychological test data, than the effects of the litigation context itself on examinee test performance." [ECF 96-3] at 7.

"the timing of certain memory-related questions is significant and may affect the validity of the results."    [ECF 96] at 3 (quoting *Wright*, 344 F.R.D. at 542).    The *Wright* court found that without a recording, there was no way to check "when during the examination those questions are asked." *Wright*, 344 F.R.D. at 542.    The same reasoning extends to ensuring other proper examination techniques are followed, particularly considering that much of the information used to formulate an opinion in neuropsychological evaluations is based on the examiner's subjective assessment. Absent a recording, "[p]laintiff will have no ability to ensure the reliability of the data from the proper questioning."    [ECF 96] at 3.[16]

Additionally, plaintiff's expert avers he has reviewed over 60 videorecorded neuropsychological assessments and has identified a number of errors, many of which could not be discovered absent the recording.    *See* [ECF 96-1] at 2–8; *see also* Otto [ECF 96-3] at 3 ("At least some support for attorneys' beliefs that forensic psychological evaluations need to be observed or . . . record[ed] is suggested by a growing body of research, indicating the inaccuracy of examiners' notes and failure of examiners to recount accurately leading questions they

---

[16] Though not binding on this Court, the District of Colorado's decision in *Wright* is instructive.    There, in agreeing with the plaintiff that recording was warranted, the court stated: "In our adversarial judicial process, evidence is generally made available to both sides.    And it is beyond dispute that a compulsory Rule 35 examination like that is being proposed here is 'a procedure embedded in the fundamental adversarial nature of litigation.'"    *Wright*, 344 F.R.D. at 542 (citation omitted).    The court then cited favorably to a lower court opinion stating:

> A video recording is an objective and complete memorialization of the exam process and would eliminate the common disputes concerning the accuracy and completeness of the examiners [sic] notes and the objectivity of the examiner. The scoring process of a neuropsychological exam, according to [Plaintiff's Expert], is nuanced, and susceptible to scoring errors, which would go undetected without the ability to review a video recording of the exam.    Furthermore, as an objective record, the video recording can be used by either party in support of their claims and defenses.

*Id.* (alteration in original) (citation omitted).    As to concern that a TPO or recording device would influence the results, the *Wright* court stated it was "unconvinced that the risk of distortion of the test results to some small degree outweighs the benefits to the truth-seeking process of having a record of the examination."    *Id.* at 542–43.

employ.").    While the Court does not presume that defendant's expert will commit any such errors here, the Court is mindful that "[a]n important focus of setting conditions for the Rule 35 examination is to promote the examination's objectivity and reliability."    *Cato*, 2018 WL 1639692, at *4.    The Court is persuaded that a videorecording capturing "'an accurate, dispute-free version' of what happened" is the best means to promote these goals here.    *Brewer*, 2023 WL 1529382, at *2 (citation omitted) (noting depositions are recorded, in part, for this reason, and "see[ing] no reason to take a different approach" with Rule 35 exams).

Lastly, as defendant concedes, any security concerns regarding the confidentiality of test questions and procedures can be mitigated via the conditions set by the Court that the recording only be disclosed to counsel for the parties and their experts, and may not be used for any other purpose outside of this litigation.

### III.    CONCLUSION

Accordingly, the premises considered, it is hereby ORDERED as follows:

1. Plaintiff's neuropsychological examination shall be videorecorded.

2. The recording shall be made promptly available to plaintiff's counsel and plaintiff's expert[s] for review.

3. The recording shall be used solely for purposes of prosecuting or defending this action and shall not be otherwise disclosed except to the parties' respective counsel, those in counsels' respective offices who are assisting primary counsel in this matter, and to the parties' respective experts.    Each person in the respective counsel offices to whom the audio recording is disclosed shall be informed that unauthorized disclosure of this material will be a violation of this Order and shall subject such individual to potential sanctions.    The audio recording is not to be made available to the general public for any purpose.

4. The parties shall meet and confer to work out the logistics and specifics for the videorecording.

**Dated:** April 25, 2024                S\_____
                                                 **RUTH MILLER**
                                                 United States Magistrate Judge